UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN McCLINTOCK,<br><br>        Plaintiff,<br><br>   v.<br><br>COLOSIMO, et al.,<br><br>        Defendants. | No. 2:13-cv-0264 TLN DB P<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights action under 42 U.S.C. § 1983. Plaintiff alleges defendants Colosimo and Beshears violated his Eighth Amendment rights to cruel and unusual punishment when they allowed a door to remain closed on him. Before the court is plaintiff's motion to be returned to the B Yard so that he can continue to participate in programs and services there. Also before the court is defendants' motion for summary judgment. Defendants argue there are no genuine issues of material fact that they were not deliberately indifferent to plaintiff's safety. For the reasons set out below, this court recommends that both motions be denied.

**BACKGROUND**

This case is proceeding on plaintiff's first amended complaint ("FAC") filed July 22, 2013. (ECF No. 15.) Since that time, some claims and defendants have been dismissed. (See

////

1

ECF Nos. 17, 58, 61.) The remaining defendants are C. Colosimo and M. Beshears, who were correctional officers at Mule Creek State Prison ("Mule Creek") at all relevant times.[1]

In his complaint, plaintiff alleges that defendant Colosimo, who was working as a control tower officer, closed a solid metal mechanical door on plaintiff as plaintiff was exiting through that door. (FAC (ECF No. 15) at 1.) "Plaintiff was kept pinned in the clamped door despite plaintiff's screams and shouting." (Id.) Defendant Beshears "was in direct visual alignment" with plaintiff and "chose to proceed with her newspaper reading" even though she had a key to manually release plaintiff from under the door. (Id.) Plaintiff was able to struggle his way out from under the door and immediately went to the B-Yard Clinic for medical care. (Id. at 1-2.)

Attached to plaintiff's complaint is a health care request form dated February 13, 2012. (Id. at 19.) Plaintiff's reasons for the request are "SOB Chest Pain 2° Door Closures, H/O Asthma." Also attached is a copy of plaintiff's appeal, filed February 14, 2012, in which he states he was trapped in the mechanical door of building 8 upon exiting. He "caught the visual attention of C/O Beshears (and auditory attention of C/O McDonald – both of whom were at podium)." (Id. at 20, 22.) Beshears then "alerted the tower staff" that plaintiff was still in the door. Plaintiff heard Colosimo state in response, "I don't care." (Id. at 22.) Plaintiff screamed, but no one responded. He eventually freed himself. (Id.)

**MOTION FOR SUMMARY JUDGMENT**

Defendants move for summary judgment. (ECF No. 79.) They contend there are no genuine issues of material fact about what occurred before, during, and after plaintiff was trapped in the door. Plaintiff opposes the motion arguing that defendants' description of those facts is incorrect. (ECF No. 83.)

////

////

////

---

[1] In his opposition to the summary judgment motion, plaintiff makes new assertions of retaliation against unnamed parties. Plaintiff may not amend his complaint at the summary judgment stage of these proceedings. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004). Therefore, the court will disregard these new assertions.

2

I. **Legal Standards**

   A. **Summary Judgment Standards under Rule 56**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.). See also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party typically may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of

affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party."  Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

### B.  Other Legal Standards

#### 1. Civil Rights Act Pursuant to 42 U.S.C. § 1983

The Civil Rights Act under which this action was filed provides as follows:

////

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. See Monell v. Dept. of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of §1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

### 2. Legal Standards for Eighth Amendment Claim

Originally, plaintiff alleged that defendant Colosimo caused the door to be closed on him and that defendant Beshear ignored his cries for help. However, in his opposition to the summary judgment motion and in his deposition, plaintiff changes his argument with respect to Colosimo. Plaintiff now appears to contend only that Colosimo and Beshear were both aware that the door had shut on him and failed to act to help him. Therefore, the appropriate analysis under the Eighth Amendment is whether defendants failed to protect plaintiff.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The "unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment prohibited by the United States Constitution. Whitley v. Albers, 475 U.S. 312, 319 (1986); see also Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105–06 (1976). However, neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." Whitley, 475 U.S. at 319.

To succeed on a failure to protect claim, plaintiff must show that objectively he suffered a "sufficiently serious" deprivation. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 298–99 (1991). He must also show that subjectively defendants Colosimo

5

and Beshears had culpable states of mind in allowing plaintiff's deprivation to occur. Farmer, 511 U.S. at 834. A prison official violates the Eighth Amendment "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. Under this standard, a prison official must have a "sufficiently culpable state of mind," one of deliberate indifference to the inmate's health or safety. Id. at 834. To avoid a finding of deliberate indifference, prison officials may show, for example:

> that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

Id. at 844.

### 3. Legal Standards for Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights. Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a court is presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson v. Callahan, 555 U.S. 223 (2009) (the two factors set out in Saucier need not be considered in sequence). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). The existence of triable issues of fact as to whether prison officials were deliberately indifferent does not necessarily preclude qualified immunity. Estate of Ford v. Ramirez–Palmer, 301 F.3d 1043, 1053 (9th Cir. 2002).

## II. Undisputed Facts

### A. Introduction

Defendants filed a Statement of Undisputed Facts ("DSUF") as required by Local Rule 260(a). (ECF No. 79-3.) Plaintiff's filing in opposition to defendants' motion for summary

judgment fails to comply with Local Rule 260(b).  Rule 260(b) requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial." Instead, plaintiff has filed only an "Opposition to the Motion for Summary Judgment of Defendants." (ECF No. 83.)  Therein, plaintiff does not reproduce the itemized facts from the DSUF and admit or deny them.  However, plaintiff does appear to take issue with some statements made in the DSUF.

In light of plaintiff's pro se status, the court has reviewed plaintiff's filings and deposition testimony in an effort to discern whether he denies any material fact asserted in the DSUF. Where he does, the court considers in the analysis of his claims in the following section what evidence plaintiff has offered that may demonstrate the existence of a disputed issue of material fact. Below, the court sets out the facts in the DSUF that plaintiff does not appear to dispute.

**B.  Undisputed Facts**

During the times relevant to this action, plaintiff was housed in building 8 at Mule Creek State Prison (MCSP) and defendants Beshears and Colosimo were correctional officers in building 8.  The only way to enter and exit building 8 is through the sally port.  The sally port is a twenty-five foot corridor with two doors at each end.  The front door allows for entry into the building 8 dayroom from the sally port; the rear door exits the building 8 sally port to the outside yard.  (DSUF ## 2-6.)

Both sally port doors open and close by mechanically sliding horizontally.  The sally port doors are controlled by the control booth officer from a panel located in the control booth.  The control booth in building 8 is located directly above the sally port. (DSUF ##7-9.)

The control booth has windows that allow the control booth officer to look into the dayroom and to look out to the yard.  The control booth panel is located by the window facing the day room, opposite of the window facing the yard.  (DSUF ##10-11.)

////

Plaintiff has never been inside of the control booth in building 8. (DSUF #12; Mar. 10, 2016 Depo. of John McClintock ("Pl.'s Depo."), lodged herein on May 19, 2016 (electronic version at ECF No. 79-5), at 35-38.) Defendant Colosimo worked regularly in the building 8 control booth. (DSUF #16.)

On February 13, 2012, Colosimo, the control booth operator, opened the sally port doors to allow plaintiff to exit building 8. As the doors opened, Plaintiff proceeded to exit building 8 through the front door and entered the sally port. Before Plaintiff exited the sally port through the rear door, three other inmates entered the sally port through the door. Plaintiff waited for the three inmates to enter through the door before he proceeded to walk through the rear door to exit the sally port. (DSUF ##21-24.[2])

Plaintiff enters and exits building 8 through the sally port doors on a daily basis, multiple times a day, and knows the speed that the doors move. (DSUF #25; Pl.'s Depo. at 60-61.) Usually, the rear door closes approximately five to ten seconds after plaintiff has exited the building. (DUSF #26; Pl.'s Depo. at 47.) It took Plaintiff approximately ten seconds longer than usual to exit building 8 through the sally port because he waited for three inmates to pass through first. (DSUF #27; Pl.'s Depo. at 46.)

There was just enough room for plaintiff to get through the door so he turned sideways to get through. (DSUF ##29, 30; Pl.'s Depo. at 68.) The solid rear door closed on plaintiff as he was exiting the building. (DSUF #31; Pl.'s Depo. at 68, 69.)

As the door came close to closing on him, plaintiff yelled, "I'm not through [the door]." (DSUF #32; Pl's Depo. at 69.) Plaintiff could not see Colosimo from that position. (DSUF #34.) What happened next is a matter of contention and is discussed below. However, the parties agree that plaintiff freed himself from the door without assistance from anyone. (DSUF #48; Pl.'s Depo. at 90.)

---

[2] Defendants state the date as February 14, 2012 in their DSUF #21. However, the date on plaintiff's health care request, which he states he submitted on the date of the incident, is February 13, 2012. (FAC (ECF No. 15 at 9) .) In addition, in their declarations, both defendants also give February 13 as the date of the incident. (May 19, 2016 Decl. of M. Beshears ("Beshears Decl.") (ECF No. 79-6) ¶ 5; May 16, 2016 Decl. of C. Colosimo ("Colosimo Decl.") (ECF No. 79-7) ¶ 8.)

### III. Analysis of Eighth Amendment Claims

#### A. Liability of Defendant Beshears

##### 1. Beshears' Statement

According to her declaration, at the time of the incident defendant Beshears was working in the dayroom of building 8 at the podium. (Beshears Decl. (ECF No. 79-6) ¶ 5.) The podium is located in the center of the dayroom and faces the control booth and the sally port. (Id.) At the time plaintiff became trapped in the door, Beshears states that she was sitting to the left of the podium and could not see directly into the sally port. (Id.)

Beshears states that she observed plaintiff running past the podium toward the sally port and ordered him to stop. (Id. ¶ 6.) She did not see plaintiff exit the building into the sally port. (Id.) She then heard someone say, "in the door." (Id. ¶ 7.) It took her a moment to realize the voice was coming from the sally port. She got up, walked to the front of the podium, looked left into the sally port and saw plaintiff caught between the door frame and the building. (Id.) According to Beshears, plaintiff did not appear to be in distress or pain "and calmly stated, 'I'm stuck in the door.'" (Id.)

Beshears did not have a key to the sally port doors. (Id. ¶ 8.) She "immediately" yelled up to Officer Colosimo in the control booth that "McClintock is in the door." (Id.) It appeared that Colosimo did not hear her. She saw him move closer to the window. However, "[b]y this time, Mr. McClintock had already freed himself from the door and exited building 8 out to the yard." (Id.) Beshears estimated that plaintiff was stuck in the door for ten to fifteen seconds. (Id. ¶ 9.)

##### 2. Plaintiff's Statement[3]

Plaintiff disputes much of Beshears story. According to plaintiff, the door was open only

---

[3] Plaintiff signed his opposition to the summary judgment motion under penalty of perjury. Therefore, the court considers it, in addition to plaintiff's deposition testimony, as evidence he has submitted for purposes of considering this pending motion. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (accepting the verified complaint as an opposing affidavit because the plaintiff "demonstrated his personal knowledge by citing two specific instances where correctional staff members . . . made statements from which a jury could reasonably infer a retaliatory motive").

about nine inches.  (Pl.'s Depo. (ECF No. 79-5) at 68.)  When he went through, he went through sideways and the door was only a couple inches from his face.  (Id.)  Plaintiff estimated that from the time the door started closing to the time it hit him was one second.  (Id. at 71.)  When the door started closing on him, he immediately yelled, "'Hey, I'm not through yet."  (Id. at 62; Pl.'s Oppo. (ECF No. 83) at 6.)   He looked at Beshears while she was seated and "made direct eye contact" with her.  (Pl.'s Oppo. at 6; Pl.'s Depo. at 52, 76-77, 83.)  He could not see Officer McDonald, the second officer at the podium.  (Pl.'s Depo. at 62.)  Beshears did not get up.  She told Colosimo plaintiff was stuck in the door while she was seated.  (Id. at 77, 83.)  Beshears then continued reading, apparently ignoring plaintiff's screams.  (Id. at 85.)

Plaintiff testified that he did not know whether all officers had keys to the doors but he "imagine[d]" they did for safety and security reasons.  (Id. at 73.)  He admitted, however, that he did not know whether Beshears had a key.  (Id. at 84.)

Plaintiff claims he was trapped by the door for more than four minutes.  (Pl.'s Oppo. at 9; Pl.'s Depo. at 27, 90.)   He testified that he was screaming, yelling, and saying, "'This hurts.  Help.'"  (Pl.'s Depo. at 27-28.)

Plaintiff states that he pried himself out of the doorway and immediately went to the health clinic.  He was treated for difficulty breathing and medical staff ordered a chest x-ray.  (Id. at 28.)  Staff gave him two ten-minute breathing treatments. (Id. at 97.)

Plaintiff testified that about six inmates asked him about "all the screaming."  (Id. at 87.)  However, he cannot identify any of them because he does not "generally know a lot of names."  (Id.)  Plaintiff then testified that he could identify a few of the inmates by nicknames.  He said one who told him he'd seen "the whole thing" was "Bobby" whose last name he believes is "Ramseys."  (Id. at 88.)  Another was "Garcia."  (Id. at 103.)

Plaintiff also estimated that 50 inmates were in the yard at that time.  (Id. at 89.)  However, none came to help him because they could potentially get in trouble.  (Id.)  Plaintiff also testified that there were three or four officers in the yard.  (Id.)  None of them responded to plaintiff's screams either.  (Id. at 89-90.)

////

10

Plaintiff testified that he did not know whether he had any lasting injuries from the incident because he did not ask the doctors he saw and he has been unable to get copies of all of his medical records. (Id. at 98-100.)

### 3. Analysis of Liability of Defendant Beshears

If Beshears ignored plaintiff's screams for help, which, according to plaintiff, included cries that he was in pain, then she was likely deliberately indifferent to his safety. The parties dispute whether plaintiff had any lasting injuries, however, that is a question regarding the extent of any damages plaintiff suffered. If, being pinned by the door caused plaintiff significant pain, and he required breathing treatments at the health care facility, then his injuries were not de minimus and he suffered sufficient harm to evidence deliberately indifferent conduct under the Eighth Amendment. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are violated . . . whether or not significant injury is evident.")

The court finds there are genuine issues of material fact regarding plaintiff's actions when he was trapped; defendant Beshears' actions when plaintiff was trapped; what, besides talking once to Colosimo, Beshears could reasonably have done; the length of time he was trapped; and what harm it caused him. To be clear, the court does not find there are any remaining issues regarding how plaintiff ended up trapped in the door. Even if it was due to plaintiff's negligence, the only issues are: (1) whether Beshear knew plaintiff was trapped and in pain; (2) whether, despite that knowledge, she did not make reasonable attempts to help him; and (3) what injuries plaintiff suffered as a result.

### B. Liability of Defendant Colosimo

### 1. Colosimo's Statement

Defendant Colosimo states that he was in the control booth in building 8 at all relevant times. (Colosimo Decl. (ECF No. 79-7) ¶ 2.) His responsibilities in that position included

> observing the inmates in the building and providing primary gun coverage for the floor officers in the building. I was also responsible for controlling inmate movement in the building, which included opening and closing the cell doors and the building doors. When inmates entered the building it was important that I identified

11

them and confirmed that they belonged in the building.

(Id.)  Colosimo states that he controlled the opening and closing of the sally port doors.  (Id. ¶ 3.)  He did not control their speed, as the doors moved at a set speed.  (Id.)

Colosimo states that from the control booth, he could observe the dayroom and the yard through windows.  (Id. ¶ 4.)  However, when he was at the control panel, he could not see the sally port directly.  (Id. ¶ 5.)  To do so, he had to walk away from the control panel.  (Id.)

Colosimo stated that it was his "normal habit" to open the sally port doors fully.  (Id. ¶ 6.)  However, Colosimo did not state whether he did so for plaintiff that day.  Typically, Colosimo allowed ten seconds after he had opened the sally port doors to close them because that was sufficient time for someone to walk through and exit the building.  (Id. ¶ 6.)

On February 13, 2012, Colosimo unlocked the doors to permit plaintiff to leave building 8.  (Id. ¶ 8.)  After he did so, he looked into the dayroom and saw three inmates entering it.  (Id.)  Colosimo stated that "[i]t was [his] responsibility to identify the three inmates who had entered to make sure they belonged in the building."  (Id.)  After pressing the control to close the sally port doors, Colosimo noticed Beshears trying to get his attention.  (Id. ¶ 9.)  He could not hear her from his position so he moved closer to the dayroom window.  (Id.)  "But, by that time, Mr. McClintock had already freed himself from the door."  (Id.)

### 2. Plaintiff's Testimony

Plaintiff disputes that Colosimo was unable to see him right away.  However, in his deposition, plaintiff admitted that he had never been in the control tower and only felt that the control operator "must" be able to see everything in the sally port for safety and security reasons.  (Pl.'s Depo. (ECF No. 79-5) at 35-38.)  Plaintiff also testified that he could not see Colosimo from his position in the doorway.  (Id. at 42.)  He further testified that he did not know whether Colosimo could hear him from the control booth.  (Id. at 45.)

Plaintiff states that after Beshears informed Colosimo that plaintiff was stuck in the door, Colosimo replied, "I don't care."  (Id. at 27, 85.)  According to plaintiff, Colosimo did nothing further while plaintiff was stuck in the door.

////

### 3. Analysis of Liability of Defendant Colosimo

Again, plaintiff has established material questions of fact regarding what Colosimo did in response to hearing that plaintiff was stuck in the door and what injuries plaintiff suffered.

## IV. Qualified Immunity

Defendants argue they are entitled to qualified immunity. Their argument is predicated on the assertion that they simply did not violate plaintiff's rights in the first place. It was well-established in 2012, and is well-established now, that a failure to protect an inmate from known, serious harm could constitute deliberate indifference in violation of the Eighth Amendment. See Farmer v. Brennan, 511 U.S. 825, 834, 837 (1994).

As described above, this court finds issues of material fact regarding the liability of defendants. Therefore the court cannot make a determination at this point that qualified immunity is appropriate on the grounds that defendants did not violate plaintiff's constitutional rights. Accordingly, this court finds any consideration of qualified immunity premature.

## MOTION TO BE RETURNED TO PRIOR HOUSING

Plaintiff complains about being moved from B Yard at Mule Creek. (ECF No. 76.) He states that the move deprived him of participation in services and programs. Plaintiff is essentially requesting a preliminary injunction ordering defendants to change plaintiff's housing assignment.

The principal purpose of preliminary injunctive relief is to preserve the court's power to render a meaningful decision after a trial on the merits. See 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2947 (3d ed. 2014). Implicit in this required showing is that the relief awarded is only temporary and there will be a full hearing on the merits of the claims raised in the injunction when the action is brought to trial. Therefore, a party seeking a preliminary injunction must show a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself." Pacific Radiation Oncology, LLC v. Queen's Med. Ctr., 810 F.3d 631, 636 (9th Cir. 2015). That relationship is sufficient to support a preliminary injunction where the injunctive relief sought is "'of the same character as that which may be granted finally.'" Id. (quoting De Beers Consol. Mines v. United

States, 325 U.S. 212, 220 (1945)). "Absent that relationship or nexus, the district court lacks authority to grant the relief requested." Id.  For similar reasons, an injunction against individuals not parties to an action is strongly disfavored.  See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 110 (1969) ("It is elementary that one is not bound by a judgment . . . resulting from litigation in which he is not designated as a party . . . .").

Plaintiff seeks an order requiring defendants to change his current housing assignment, a subject which is not the basis of his complaint in this action.  Further, plaintiff fails to show that defendants Colosimo and Beshears have any authority to change his housing assignment.  For these reasons, plaintiff's request for injunctive relief should be denied.

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1. Defendants motion for summary judgment (ECF No. 79) be denied; and
2. Plaintiff's motion to be returned to previous housing (ECF No. 76) be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 1, 2017

/s/ Deborah Barnes
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-civil rights/mccl0264.msj fr